# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBIN STEPHENS,

        Plaintiff

           v.

SHUTTLE ASSOCIATES, L.L.C.,
SUPERSHUTTLE INTERNATIONAL, INC.,
NEW YORK CITY TRANSIT AUTHORITY,
MANHATTAN AND BRONX SURFACE TRANSIT
OPERATING AUTHORITY, and "JOHN DOE," NYCT
BUS DRIVER
        Defendants

DKT. NO. 07-cv-5614 (VM)

AMENDED
COMPLAINT

---

Plaintiff, by her attorney, Aaron David Frishberg, complaining of the acts of Defendants,
avers as follows:

## PARTIES

1.    At all times mentioned herein, Plaintiff, ROBIN STEPHENS, was a resident of
Colorado, who was disabled within the meaning of the Americans with Disabilities Act, the
New York State Human Rights Law, and the New York City Human Rights Code. At all times
mentioned herein, Plaintiff was qualified to use the services of a provider of public
transportation, in that, with a reasonable modification of the transportation program to
accommodate her disabilities, she was capable of using public transportation.

2.    Plaintiff has a disability which impairs her in the major life function of walking and
uses a power wheelchair. Plaintiff is also disabled in the major life function of speech, and
many people have some difficulty understanding her speech, although most people can
understand her if they listen carefully and persistently.

3.    Defendant SHUTTLE ASSOCIATES, LLC. was at all times mentioned herein a
limited liability company organized under the laws of New York.

4.    Defendant SUPERSHUTTLE, INTERNATIONAL, INC., was at all times mentioned
herein a Colorado business corporation doing business in New York. Upon information and
belief, Defendant SHUTTLE ASSOCIATES, LLC was at all times mentioned herein a wholly

owned subsidiary of Defendant SUPERSHUTTLE, INTERNATIONAL, INC. As used herein, "SUPERSHUTTLE" refers to the operations of. in New York City, under the control of SHUTTLE ASSOCIATES, LLC and upon information and belief, Defendant SUPERSHUTTLE, INTERNATIONAL, INC. At all times mentioned herein, all employees and agents of Supershuttle acted under the direction and control of SHUTTLE ASSOCIATES, LLC, and upon information and belief, SUPERSHUTTLE INTERNATIONAL, INC.

5.     At all times mentioned herein, SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC. solicited the business of persons seeking to travel between New York area airports and Manhattan, including soliciting the business of persons with disabilities, including persons who use wheelchairs, and held themselves out as capable of providing equal service to persons with disabilities, including persons who use wheelchairs.

6.     At all times mentioned herein New York City Transit Authority (NYCT) and Manhattan and Bronx Surface Transit Operating Authority (MaBSTOA) were public authorities organized under the laws of New York and doing business in the City of New York.

7.     At all times mentioned herein, "John Doe", a bus driver whose true name is not known to Plaintiff, acted as the agent and employee of Defendants NYCT and MaBSTOA.

As a First Cause of Action

8.     On April 3, 2006, Plaintiff's assistant called to make reservations for Plaintiff on SuperShuttle for an accessible wheelchair ride for Friday, April 7, 2006 at 5:00 p.m. and Monday, April 10, 2006 and 2:00 p,m. in New York City, respectively from and to LaGuardia Airport.

9.     The SuperShuttle agent told Plaintiff's assistant that the accessible shuttle was not available at 5:00 p.m. on Friday, and agreed to a 6:00 p.m. pickup at LaGuardia Airport. SuperShuttle took Plaintiff's cell phone number in order to contact her if there were problems.

10.    Plaintiff's plane from Denver to LaGuardia Airport was delayed on April 7, 2006. She got to the pickup location at LaGuardia at 5:52 p.m., and called SuperShuttle to tell them she was there and to find out the time for the pickup. The first person at Supershuttle Plaintiff attempted to speak with hung up on Plaintiff.

11.    In the course of her dealings with SuperShuttle over the weekend, Plaintiff was hung up on when she telephoned SuperShuttle a total of at least thirteen times, for no better reason than that SuperShuttle personnel had not been adequately trained to interact on the telephone with persons with disabilities affecting their speech, and that these persons therefore did not take the time or make the effort to understand her speech, or to transfer her call to someone who would do so.

12.    On her second attempt to speak with someone at Supershuttle, Plaintiff reached an operator who understood the reservation number. Plaintiff was then informed that one of the two SuperShuttle wheelchair accessible vans had broken down that day, so it would be an hour and a half before her ride would get to the airport.

13.    At no time had SuperShuttle attempted to call Plaintiff's cell phone to inform her of the anticipated delay of one and one-half hours in picking her up.

14.    Plaintiff determined that she could get to Manhattan by M-60 public bus more quickly than by waiting for SuperShuttle, and called SuperShuttle to cancel the ride.

15.    At Plaintiff's request, Ms. Laura Hershey called SuperShuttle on Sunday evening, April 9, 2006, to ask about Monday's return ride. Ms. Hershey was told that the ride was scheduled, and that it would be accessible. Ms. Hershey was assured that SuperShuttle had more than one accessible vehicle in service.

16.    On Monday, April 10, 2006 at approximately 7:55 a.m., Plaintiff called both SuperShuttle's toll-free 800 number and its local number, in an attempt to confirm her ride. She made at least five phone calls, on each of which SuperShuttle employees hung up on Plaintiff, that morning.

17.    On what was at least her sixth call to Supershuttle of the morning, Plaintiff was finally transferred to a supervisor, who confirmed all the relevant information. Plaintiff also learned during that call that there was only one accessible van in service, but the supervisor guaranteed her that her pickup would arrive at the designated location on time.

18.    At about 1:00 p.m., Plaintifff called SuperShuttle to again confirm her ride to LaGuardia Airport. She had to place this call at least seven times, because on each of the prior occasions, Supershuttle's telephone operators hung up on her, making a total of at least twelve times that day that Plaintiff had been hung up on by Supershuttle operators as she attempted to confirm her ride.

19.    When she finally reached someone at Supershuttle who took the trouble to understand her, Plantiff was assured that her ride would meet her at 132 Nassau Street at 2:00 p.m.

20.    At 2:00 p.m., Plaintiff was downstairs at 132 Nassu Street. Seeing no shuttle, Plaintiff telephoned Super Shuttle, to find out the estimated time of arrival. When she was finally able to reach a live person, after several minutes, her call was transferred to several other SuperShuttle personnel. Plaintiff was then informed that the van was unable to get to 132 Nassau Street due to blocked streets. Plaintiff told the person on the phone the cross street was Beekman Street and that cars and vans were getting through on that street. She was asked to go to the corner of Fulton and another street, where the van was.

21.    The SuperShuttle agent continually interrupted Plaintiff, did not listen to her, and did not respond to her attempt to explain that since she did not know her way around the area, she could not locate the van without directions. Instead, he repeated, talking over Plaintiff, that she should go to the location he had mentioned.

22.    At 2:20 p.m., being unable to locate the Supershuttle van, and fearful of missing her flight and being stranded in New York, Plaintiff, Plaintiff proceeded to the bus stop for the Northbound M-15 1st Avenue bus, to connect with the M-60 bus to LaGuardia Airport.

23.    Shortly after she boarded the bus, SuperShuttle called Plaintiff's cell phone and left the message that they wanted to meet her at Nassau and Fulton Streets This was an intersection she could have located had it been offered before she was on a northbound bus, but by this time it would have been impossible to double back to that site, being on a bus heading up First Avenue.

24.    After attempting without success to call SuperShuttle directly, Plaintiff called Ms. Hershey, and relayed the query where on 1st Avenue they wanted to pick Plaintiff up. Ms. Hershey called back, and told Plaintiff that Supershuttle would meet her at 46th Street and First Avenue. Plaintiff had Ms. Hershey call back Supershuttle and confirm that she was on her way to that intersection.

25.    Someone from SuperShuttle called Plaintiff while she was crossing a busy street on her to way to 46th Street. She told the person she could not talk and was on her way to 46th Street., and hung up.

26.    When Plaintiff arrived at 46th Street, the SuperShuttle was nowhere in sight. Plaintiff waited several more minutes at that location, without seeing the SuperShuttle van.

27.    Seeing that she had wasted 30 minutes, and knowing that she would not be able to get the M-60 bus to the airport in time if she did not get back on the bus, Plaintiff traveled to 52nd Street in her wheelchair and got the next northbound M-15.

28.    By this time, the battery on Plaintiff's cell phone, which she was using solely to communicate in an effort to coordinate her ride to LaGuardia Airport, was losing power. It had been almost fully charged that morning.

29.    Plaintiff called Ms. Hershey to inform her she was on the bus and left a message. Ms. Hershey, upon receiving the message, called SuperShuttle, and was told that SuperShuttle would not give Ms. Stephens a ride to the airport.

30.    When Ms. Hershey reached Plaintiff with this news, at 3:39 p.m., Plaintiff informed Ms. Hershey she was back on the bus and would try to get the M-60 bus to get to the airport

on time.

31.    At Plaintiff's request, Ms. Hershey called the airline about later flights, and called back to inform Plaintiff that there were no other flights to Denver that day after 5:00 pm.

32.    Plaintiff was on the bus at 110th Street when the phone rang at 3:44 p.m. and a woman from SuperShuttle asked her where she was. Plaintiff answered that she was at 125th Street and 1st Avenue. The woman asked her to hold on the line but Plaintiff had to tell her that she could not do so, since her cell phone battery was dying, and then hang up.

33.    A few minutes later the woman called back and informed Plaintiff that her ride would be at 125th Street and 1st Avenue. The woman did not tell Plaintiff how long it would be before the van arrived. At no time was Plaintiff given a phone number to call SuperShuttle directly.

34.    After getting to 125th Street in approximately eight minutes, Plaintiff waited at 125th Street and 1st Avenue for an additional 15 minutes,. After attempting to call SuperShuttle without success, she called Ms. Hershey and told her that SuperShuttle had called her and told Plaintiff they would be there. She asked Ms. Hershey to call SuperShuttle and find out when they would be there. Plaintiff informed Ms. Hershey she was going to 125th and 2nd Avenues, and would get on the next M-60.

35.    Plaintiff attempted to travel on the sidewalk to 2nd Avenue, but could not mount the curb in her wheelchair, and had to go back to 1st Avenue, and traveled on the street to 2nd Avenue, taking her life in her hands, where she waited there for the next M-60 bus.

36.    As the M-60 was getting to 125th and 2nd at 4:13 p.m., Ms. Hershey called Plaintiff and informed her SuperShuttle would be at 125th Street and 1st Avenue in 7 to 10 minutes. Plaintiff crossed back over 2nd and traveled on 125th Street to 1st Avenue.

37.    SuperShuttle arrived at or around 4:25 p.m. After Plaintiff had entered and been secured in the van, it left 125th Street and 1st Avenue at approximately 4:30 p.m.

38.    The driver called into dispatch to inform them of his pick-up. The dispatch person, speaking over the speaker phone audibly about Plaintiff, as if Plaintiff were not present, said something to the effect that the dispatcher " was the only person who could understand her" and "you have earned your wings today." The driver responded with "yes, someday I will reap the rewards."

39.    En route, Plaintiff called United Air Lines to check the status of her flight, and learned that it was on time.

40.    Upon arriving at the airport, Plaintiff was not able to use self check-in to save time because it was less than 30 minutes from the departure time. She enlisted the help of United

Air Line employees, one of whom ran with Plaintiff to security, where she was hand-screened, and through the airport to the door at 5:00 p.m. just as the airline was shutting the gate.

41.     The plane was delayed 15 minutes in taking off due to Plaintiff's lateness.

42.     Plaintiff, who had not had lunch because she had expected to eat at the airport in New York, did not eat until she got to home at 10:30 P. M. EST (8:30 MST).

43.     Because of her lateness, caused by Supershuttle, Plaintiff was unable to get her reading glasses before boarding the flight.

44.     Plaintiff's cell phone battery died when she got to Denver. She barely had an opportunity to speak with Ms. Hershey after trying several times and having the phone battery die.

45.     Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. had, at most, only two wheelchair accessible vans for the use of persons with disabilities, going two and from New York airports, while maintaining a fleet of non-accessible vehicles.

46.     Defendants SHUTTLE ASSOCIATES, LLC and Supershuttle, International, Inc., knew or should have known that this was not an adequate number of accessible vehicles to provide an equivalent level of services as they provided to their other customers to persons who needed accessible vans, and that their services would be totally inadequate whenever one of the two vans was out of service.

47.     Iin failing to make arrangements to have accessible van service available within a reasonable time for travel between area airports and Manhattan, Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC., failed to provide equal access to its facilities and services for persons with disabilities.

48.     Plaintiff has occasion to travel to New York by air, and but for Defendants' discriminatory failure to provide reasonable access, would have occasion to utilize their ground transport service to Manhattan.

49.     In failing to train their employees to interact courteously on the telephone with persons with disabilities which impair their ability to make themselves understood on the telephone, and in failing to maintain alternative telephone connections, eg., TTY telephones, Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC., failed to provide equal access to their facilities and services for persons with disabilities, causing Plaintiff injury.

50.     As a result of the discriminatory treatment by Defendants, Plaintiff suffered anxiety,

distress, humiliation, emotional and physical pain and suffering.

51.     Although Plaintiff continues to travel to New York City by air periodically, she has been compelled to rely upon public transportation to and from airports rather than risking a repetition of the discriminatory experience with Supershuttle which almost caused her to be stranded, missing her flight, and inflicted enormous emotional distress upon her.

52.     Defendants' actions and failures to act violated Title II-B of the Americans with Disabilities Act, 42 U.S.C. § 12141 et seq., and Title III, 42 U.S.C. § 12181 et seq.

As a Second Cause of Action

53.     Plaintiff repeats as if stated here in full ¶¶ 1-52 of this Complaint.

54.     Congress, in enacting the Americans with Disabilities Act, directed that the Secretary of Transportation promulgate regulations to implement the transportation provisions of the Act.

55.     Pursuant to that authority, the Secretary of Transportation adopted regulations, found at 49 CFR § 37.173, requiring that providers of public transportation ensure that their personnel are trained to proficiency to properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities.

56.     Defendants Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC., failed to train their employees to proficiency in assisting persons with disabilities, causing Plaintiff injury.

As a Third Cause of Action

57.     Plaintiff repeats as if stated here in full ¶¶ 1-56 of this Complaint.

58.     The discriminatory acts of Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. violated the New York State Human Rights Law, Executive Law §§ 290 et seq., causing Plaintiff injury

As a Fourth Cause of Action

59.     Plaintiff repeats as if stated here in full ¶¶ 1-58 of this Complaint.

60.     The discriminatory acts of Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. violated the New York City Human Rights Code, New York City Administrative Code, §§ 8-101 et seq., causing Plaintiff injury.

As a Fifth Cause of Action

61.    Plaintiff repeats as if stated here in full ¶¶ 1-60 of this Complaint.

62.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL INC., on the Supershuttle website and elsewhere, held out the services of SHUTTLE ASSOCIATES, LLC in as providing equal, accessible service to persons with disabilities, and in particular persons using wheelchairs.

63.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC., advertised on the SuperShuttle website that "Supershuttle is committed to providing exceptional guest service for our customers with disabilities, including those who use wheelchairs."

64.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC., advertised on the SuperShuttle website that "SuperShuttle does not discriminate against individuals with disabilities in the provision of its services."

65.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC., advertised on the SuperShuttle website that "Customers requiring the use of accessible transportation are also encouraged, but not required, to make reservations for outbound trips at least 24 hours in advance and to specify the need for accessible transportation. As to such reservations and except for certain outlying areas, SuperShuttle will use its best efforts to fulfill such reservations within 30 minutes of the requested pick-up time. "

66.    Upon information and belief, Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. had purchased the two accessible vans that were in use in New York no later than October, 2002, and had maintained records of the periods when each of these accessible vans was not in operable condition.

67.    Upon information and belief, Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. had kept records from 2002 forward of the complaints they received from persons with disabilities who were denied equal service.

68.    Based upon the information collected in their logs and records, Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. must have known or been recklessly indifferent to the fact that they could not provide, or make "best efforts" to provide, accessible van service within thirty minutes of requested time to persons with disabilities requiring accessible van service, with only two accessible vans.

69.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE

INTERNATIONAL, INC. knew that the promised level of service, best efforts to provide accessible service within thirty minutes of the requested time, with the exception of some outlying areas, was facially not equal to and therefore discriminatory in comparison with its promise of best efforts to provide service within fifteen minutes of requested time, to persons who did not require wheelchair-accessible service.

70.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. willfully misrepresented the services that they were prepared to provide to persons with disabilities in their website advertising, and elsewhere, in violation of General Business Law § 349.

71.    Plaintiff was injured by her reliance on the misrepresentations of Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE, INTERNATIONAL, INC.

### As a Sixth Cause of Action

72.    Plaintiff repeats as if stated here in full ¶¶ 1-71 of this Complaint.

73.    Defendants SHUTTLE ASSOCIATES, LLC and SUPERSHUTTLE INTERNATIONAL, INC. subjected Plaintiff to a series of indignities which were proximately caused by these defendants' intentional reckless conduct in disregard of Plaintiff's well-being, after undertaking to provide her with a service.

74.    Defendants' actions and failure to act constituted intentional infliction of emotional distress, causing Plaintiff injury.

### As a Seventh Cause of Action

75.    Plaintiff repeats as if stated here in full ¶¶ 1-74 of this Complaint.

76.    On Sunday, April 9, 2006 at or about 5:00 p.m. Plaintiff boarded the M-15 First Avenue bus operated by Defendants New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority in her wheelchair, at the Confucius Plaza stop in lower Manhattan.

77.    The driver operating the bus, Defendant "John Doe," whose true name is unknown to Plaintiff, demanded that she turn off her power wheelchair.

78.    Plaintiff asked "why?"

79.    The driver, without giving any explanation or otherwise responding to Plaintiff's question, repeated his demand that she turn off the power on her wheelchair.

80.    Plaintiff did not turn off the power on her wheelchair, and repeated her request for an explanation, which was not forthcoming from the driver.

81.    After several minutes of waiting, the driver announced to the other passengers on the bus that they would have to take the next bus, because Plaintiff was not turning off her wheelchair, and had the passengers leave the bus.

82.    Plaintiff waited for over almost forty minutes on the bus, until a supervisor arrived at the scene.

83.    At no time during the half-hour she was waiting while the bus was standing still did the bus operator offer to secure Plaintiff's wheelchair with the straps the bus was equipped with for that purpose.

84.    Had Plaintiff turned off her wheelchair without the chair secured, the movement of the bus would have caused her to be thrown about on the bus.

85.    When the supervisor arrived, he relieved the driver, told Plaintiff she would not have to turn off her chair, asked if he could secure Plaintiff's chair, which she gave him permission to do, and after securing the chair, drove the bus directly to Plaintiff's destination.

86.    The acts and failure to act of Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY, by their agent and employee, "JOHN DOE" deprived Plaintiff of equal access to public transportation in violation of Title II of the Americans with Disabilities Act, 42 U.S. C. § 12131, et seq., Title II-B, 42 U.S.C. § 12141 et seq., and Title III, 42 U.S.C. § 12181 et seq.

### As an Eighth Cause of Action

87.    Plaintiff repeats as if stated here in full ¶¶ 1-7 , 54-55 and 76-86 of this Complaint.

88.    "JOHN DOE"'s discriminatory treatment of Plaintiff was proximately caused and contributed to by the failure of Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY to train their personnel to proficiency to properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities, causing Plaintiff to be discriminated against and to be emotionally injured.

### As a Ninth Cause of Action

89.    Plaintiff repeats as if stated here in full ¶¶ 1-7 , 54-55 and 76-86 of this Complaint.

90.    Upon information and belief, at all times mentioned herein, Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY have been recipients of federal funds.

91.    These Defendants acts and failure to act, causing Plaintiff to be discriminated against, violated the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq.

### As Tenth Cause of Action

92.    Plaintiff repeats as if stated here in full ¶¶ 1-7 , 54-55  and 76-86 of this Complaint.

93.    The acts and failure to act of Defendants  NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY caused Plaintiff to suffer discriminatory treatment within the meaning of the New York State Human Rights Law, Executive Law § 290 et seq.

94.    Defendant "John Doe" aided and abetted discriminatory treatment by Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY, in violation of the New York State Human Rights Law .

### As an Eleventh Cause of Action

95.    Plaintiff repeats as if stated here in full ¶¶ 1-7 , 54-55  and 76-86 of this Complaint.

96.    The acts and failure to act of Defendants  NEW YORK CITY TRANSIT AUTHORITY and  MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY caused Plaintiff to suffer discriminatory treatment within the meaning of the New York City Human Rights Code, Administrative Code § 8-101 et seq.

97.    Defendant "John Doe" aided and abetted discriminatory treatment by Defendants NEW YORK CITY TRANSIT AUTHORITY and Manhattan and Bronx Surface Transit Operating Authority, in violation of the New York City Human Rights Code.

### As a Twelfth Cause of Action

98.    Plaintiff repeats as if stated here in full ¶¶ 1-7 and 76-86 of this Complaint.

99.    The acts of Defendant "JOHN DOE", acting within the scope of his employment by Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY subjected Plaintiff to the intentional infliction of emotional distress, causing her injury.

100.    A timely notices of claim were served on Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY.

101.    Defendants NEW YORK CITY TRANSIT AUTHORITY and MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY have not adjusted Plaintiff's claim.

Wherefore, Plaintiff requests that this Court grant a judgment against each of the Defendants for monetary relief in an amount to be determined by the finder of fact, but in excess of the jurisdictional limit of any lower state court, together with exemplary damages on her causes of action and against those parties against whom exemplary damages are permitted, including trebled damages for wilful violation of § 349 the General Business Law, injunctive relief preventing Defendants from discriminating against Plaintiff and requiring them to take measures including training of their employees to insure against such discriminatory practices, together with reasonable attorneys' fees and the costs and disbursements of this action.

Yours, etc.

Aaron David Frishberg
Attorney for Plaintiff
116 W. 111th Street
New York, NY 10026
212 740 4544

# EXHIBIT B

Notice of Claim Against the New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority

1. Name and address of Claimant and her attorney

Robin Stephens
1466 S. Lincoln Street
Denver, CO 80210

Aaron Frishberg, Esq.
116 W. 111th Street
New York, NY 10026

2. Nature of the claim: intentional and negligent infliction of emotional distress.

3. Time, place and manner in which claim arose: On or about April 8, 2006, at Chatham Square, in Manhattan, about 6:00 p.m., claimant boarded the M-15 bus # 5532 in her power wheelchair. The bus driver raised a seat to allow her to position her wheelchair in the designated seat, but did not offer to secure her wheelchair with the straps installed on that part of the bus for that purpose The bus driver then returned to the wheel of the bus, and told claimant to turn off the power on her wheelchair. Claimant asked why, and the driver did not respond, except to repeat the demand that she turn off the power on the wheelchair. Had she done so, in her experience with the wheelchair not strapped into place, nothing would have prevented the movement of the bus from throwing claimant and her wheelchair about. The driver continued to demand that claimant turn off the wheelchair before he would proceed on the route, and eventually, after twenty minutes, offloaded the ten other passengers, except the claimant and her companion, onto another M-15 bus. Claimant was kept waiting for over half an hour, until a supervisor arrived, told claimant that she did not have to turn off the power on her wheelchair, and asked claimant if they could strap her wheelchair in. Claimant responded that the bus driver had never offered to do so. With the wheelchair strapped into place, the supervisor relieved the driver and drove claimant and her companion to their destination stop.

4. Nature of injuries:, emotional distress, humiliation,, anger, and upset causing injuries in the amount of one-million dollars.

Robin Stephens

Sworn to before me this 5 day of June, 2006, by Robin Stephens
My commission expires: 8/17/2008

Notary Public

RECEIVED BY CERTIFIED MAIL

# EXHIBIT C

New York City Transit Authority
Law Department
130 Livingston Street
Brooklyn, New York   11201

NOTICE TO APPEAR FOR
ORAL EXAMINATION

June 27, 2006

FRISHBERG, AARON
116 WEST 111TH STREET
NEW YORK        NY 10026            Claim No.:  BU  20060408 0010 001

Re:  ROBIN STEPHENS

By virtue of the power conferred on the New York City Transit Authority by
Sec. 1200 et seq, as amended, of the Public Authorities Law, the claimant is hereby required to
appear and be sworn at the Office of the Authority, Room 11127, 130 Livingston Street, Brooklyn
New York on July      6 ,   2006 at 10 : 30 A M  and testify as to all facts relative to
the above claim presented by you to the Authority.

                    Martin B. Schnabel
                    Vice President and General Counsel
                    By: Wallace D. Gossett
                    Executive Assistant General Counsel

In order to obtain a prompt disposition of your claim, please bring with you a copy of
your doctor's certificate including the date of your last treatment and amount of his
bill; X-rays, and X-ray reports; authorization for hospital records; a statement from
employer as to salary, and as to lost time and earnings, if any.  Also, you must bring
proper photo ID and any and all other proof regarding your claim for special damages.

IF AN INTERPRETER IS NECESSARY, THIS OFFICE MUST BE NOTIFIED AT LEAST THREE DAYS PRIOR TO
HEARING DATE SCHEDULED ABOVE. Please be advised that failure of your client to appear for
this appointment will result in your office being billed for any no-show fees incurred.
Any such fee(s) will be deducted from any future settlements paid to dispose of this
matter.

Application for adjournment should be made at least one day prior to the date set for the
examination.  No adjournment may be had except on written stipulation and in the form
given below:

              For information pertaining to adjournment or interpreter,
                    Call 718-694-4646

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Claim No.: BU 20060408 0010 001        Form of Adjournment
FRISHBERG, AARON

                    Prepare in duplicate.
                    Copy will be returned to you.

      It is hereby stipulated that the examination of claimant be adjourned from

The       Day of              ,       , at        O'clock   M  to the

          Day of              ,       , at        O'clock   M

With the distinct understanding that such adjournment is without prejudice to the
right of the New York City Transit Authority to settle or adjust
the claim within the same period of the time after such examination is held as
the Authority had at the date fixed originally for such examination, and that no
suit may be brought until after the expiration of such period of time.

Dated:              _____

                    Attorney for Claimant


                    New York City Transit Authority

          By:       _____

NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW
COVER LETTER

NYCTA
130 Livingston Street, 10th Floor
Brooklyn, N.Y.  11201
718-694-4869
Attn: Joan Jones, Benefits Examiner

| DATE | POLICY HOLDER | POLICY NUMBER | DATE OF ACCIDENT | CLAIM NUMBER |
|------|---------------|---------------|------------------|--------------|
| 6/27/2006 | NYCT | N/A | 4/08/2006 | BU 20060408 0010 001 |

AARON FRISHBERG
116 WEST 111TH STREET

NEW YORK          NY 10026

Re:  ROBIN     STEPHENS

COMPLETE THE ATTACHED DB-450 FORM IMMEDIATELY IF
YOU ARE ENTITLED TO NEW YORK STATE DISABILITY
BENEFITS AND MAIL OR GIVE IT TO YOUR EMPLOYER.   TO
FIND OUT IF YOU ARE ELIGIBLE, TELEPHONE THE NEW
YORK STATE DISABILITY BENEFITS BUREAU AT
(718)802-6964.

DEAR APPLICANT:

This will acknowledge receipt of notice that you may have sustained injuries in the above
captioned accident.  The New York No-Fault Law provides for the payment of benefits to victims of
motor vehicle accidents to reimburse them for their basic economic loss.  Briefly summarized,
basic economic loss consists of up to $50,000 per person in benefits for the following:

   a.  all necessary doctor and hospital bills and other health service expenses, payable in
       accordance with fee schedules established or adopted by the New York State Insurance
       Department;

   b.  80% of lost earnings up to a maximum monthly payment of $2,000 for up to three years
       following the date of the accident;

   c.  up to $25.00 per day for a period of one year from the date of the accident for other
       reasonable and necessary expenses the injured person may have incurred because of an injury
       resulting from the accident, such as the cost of hiring a housekeeper or necessary
       transportation expenses to and from a health service provider; and

   d.  a $2,000 death benefit payable to the estate of a covered person, in addition to the
       $50,000 coverage for economic loss described above.

Additional benefits may be owed to you if the above policy has been endorsed to include Optional
Basic Economic Loss coverage and/or Additional Personal Injury Protection coverage.

In determining the benefits payable to you under the No-Fault Law, amounts recovered or
recoverable on account of the accident from Workers' Compensation, New York State Disability,
and certain wage continuation plans will reduce your no-fault benefits.  Therefore, if
you are entitled to any of these benefits you should make your claim for them promptly.

If you are a named insured or relative under a Manadatory Personal Injury Protection policy which
includes OBEL coverage, you may be entitled to an additional $25,000 of Basic Economic Loss
coverage.  You should make your claim to that motor vehicle insurer promptly, but in no event later
than 90 days after your $50,000 of Basic Economic Loss coverage under this policy is exhausted.

NOTE:  The No-Fault Law provides that if you are injured on a bus or a school bus in New York
State, No-Fault benefits must be paid by your auto insurer or if you have no auto, the auto
insurer of a relative with whom you reside.  The law further provides that you should only file a
No-Fault claim with the insurer of the bus or school bus if there is no such auto policy in your
household.  If the above rule does not apply, you may file a No-Fault claim with the insurer of the
bus or school bus if you are operator, owner or employee of the owner of the bus company

To enable us to determine if you are entitled to any No-Fault benefits, please complete and
immediately return the enclosed APPLICATION FOR MOTOR VEHICLE NO-FAULT BENEFITS (NYS FORM NF-2)
along with copies of any bills you have received to date.  This application must be sent to us within
30 days of the accident date if your original notice to us was not in writing.

You are entitled to receive health service benefits without any time limit if it is possible
to determine during the first year after the accident that further health services may be required
after the first year.  As you receive additional medical bills or any other bills you believe to be
covered, send them to us immediately.  In order to be considered for payment, all bills for health
care services must be submitted within 45 days of treatment.  If it is not possible for you or your
health care provider to submit these bills within that time period, submit a written explanation of
the reason for the delay.  Claims for lost earnings and other reasonable and necessary expenses must
be submitted within 90 days. We will reimburse you as soon as we are able to verify that they are
covered expenses under No-Fault.  Please identify all communications with us with the claim number
shown above.  Should you have any questions concerning your claim, we will be most happy to assist
you.  Please feel free to call the claim representative at the phone number provided at the top of
this page.

PLEASE NOTE THAT THE TIME ALLOWED FOR PROVIDING NOTICE AND PROOF OF CLAIM TO YOUR INSURER HAS BEEN
REDUCED. FAILURE TO RETURN A COMPLETED APPLICATION FOR MOTOR VEHICLE NO-FAULT BENEFITS FORM (NF-2)
TO YOUR INSURER TIMELY CAN RESULT IN LOSS OF ALL BENEFITS. FAILURE TO SUBMIT BILLS FOR HEALTH CARE
SERVICES WITHIN 45 DAYS OF TREATMENT OR MAKE CLAIM FOR LOST EARNINGS OR OTHER REASONABLE AND
NECESSARY EXPENSES WITHIN 90 DAYS OF OCCURRENCE CAN RESULT IN THOSE BENEFITS BEING DENIED. If your
insurer denies coverage for failure to make a timely submission you can provide them with a written
reply stating why you could not reasonably meet the time frames and your insurer must consider it.

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR COMMERCIAL INSURANCE OR STATEMENT OF CLAIM FOR ANY COMMERCIAL OR PERSONAL INSURANCE BENEFITS CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, AND ANY PERSON WHO, IN CONNECTION WITH SUCH APPLICATION OR CLAIM, KNOWINGLY MAKES OR KNOWKNOWINGLY ASSISTS, ABETS, SOLICITS OR CONSPIRES WITH ANOTHER TO MAKE A FALSE REPORT OF THE THEFT, DESTRUCTION, DAMAGE OR CONVERSION OF ANY MOTOR VEHICLE TO A LAW ENFORCEMENT AGENCY, THE DEPARTMENT OF MOTOR VEHICLES OR AN INSURANCE COMPANY, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE VALUE OF THE SUBJECT MOTOR VEHICLE OR STATED CLAIM FOR EACH VIOLATION.

Very truly yours,

_____

IMPORTANT REMINDERS

PLEASE ANSWER ALL QUESTIONS ON THE APPLICATION FORM AND SIGN BOTH
AUTHORIZATIONS SO THAT WE MAY GIVE PROMPT ATTENTION TO YOUR CLAIM

*LANGUAGE TO BE FILLED IN BY INSURER OR SELF-INSURER.
NYS FORM NF-1A (Rev 1/2004)

# EXHIBIT D

Transcript of Command Center recordings:

CC is SLD Valentino until second 18:34 recording, then SLD Nicholas Agro

| 18:29 | |
|-------|---|
| B/O | Hello this is 92-103 |
| CC | Yes |
| B/O | We have a Wheelchair, one of those automated wheelchair on bus. Lady don't want to cut it off. What can I do? |
| CC | Have a wheelchair and what? |
| B/O | Have one those automatic wheelchairs that the lady on bus, she have it on. I asked her to turn it off, she don't want to turn it off. So what should I do. The thing might jump in gear |
| CC | What's, what's the reason she doesn't turn it off? |
| B/O | She don't want to turn it off, that's why I called you. I don't know why she don't want to turn it off. |
| CC | She's got to turn it off. What's your payroll #? |
| B/O | 30280 |
| CC | Somebody leans on it, somebody bumps it, it can go forward. What's, what's your location? |
| B/O | Just coming out from City Hall at the last gate coming up on __ North bound. 10-4. |
| CC | So you're at City Hall now? |
| B/O | Coming out from City Hall at the last gate going North bound. |
| CC | All right, we'll send you somebody over there. Copy. |
| B/O | What? |
| CC | Right, we'll send somebody over there. Copy |
| B/O | |
| CC | We will send you somebody over there.. |
| B/O | Copy. Thank you. |
| CC | Unless she decides to shut it off, in that case call us back |
| 18:33 | |
| | Go ahead |
| CC | She secure the wheelchair yet? Did she secure, she let you secure the wheelchair yet? |
| | |
| 18:34 | |
| CC | Did she secure the wheelchair yet? |
| B/O | No, but she don't want to turn it off. |
| CC | It could go down the aisles, I mean… |

-#980949
2007-9954

| B/O | Excuse me? |
|---|---|
| CC | She's got to stay still. |
| B/O | But she don't want to turn the wheelchair off. I can tie her down but she don't want to turn it off. |
| | |
| | |
| 18:34 | |
| CC | Alright, well does she understand we can't move the bus like this, that she's holding everybody up? |
| B/O | Yes I explained that to her, but she don't talk that clear. She's got someone talking to her, somebody, some lawyer that's in that . . . can't understand her that clear, kind of handicapped. Copy |
| CC | Just sit there, we'll get somebody there to see you. |
| | |
| CC | 586 go ahead |
| Unk | 7854, 6-101, 20 on the BH 26, she is back on the service without the wheelchair, lost two shorts, one in service at this time, copy |
| CC | You got it? Thanks. |
| Unk | You're welcome |
| | |
| 18:35 | |
| | Alright, this is dispatch, in the dispatch |
| | Dispatch on the M103. 5532 down at City Hall. |
| CC | Down at City Hall with wheelchair customer aboard who refuses to be secured, she's moving the chair, she's up and down the aisle with the chair, she refuses to sit still. |
| | |
| CC | Okay Dennis, it's 18:37 |
| 18:42 | |
| CC | Yeah, 535 go ahead |
| SLD | Give me the bus # for that City Hall bus? |
| CC | 5532 |
| | 485 to 484, on the 23 downtown, we have a bus change, 22 is now driving 1071 |
| 18:51 | |
| SLD | Hey Nicky |
| | |
| CC | Yes Dennis, go ahead. |
| SLD | Guy's at City Hall? |
| CC | Yeah, that's what he told me. |
| SLD | Do me a favor, call him back, I have a feeling he might be down by the Credit Union over there. |
| CC | All right Dennis, Ok, I'll call the bus right now. |

| | |
|---|---|
| 18:52 | |
| | 92103 |
| CC | What is your exact location. I've got a patrol car trying to locate you. |
| B/O | Well, I'm on Park Row. North bound from the last toll booth before the barricades going north bound, at the bus stop. |
| CC | So you're at Park Row? |
| B/O | Yes, last bus stop going, coming out from the barricades, going northbound. |
| CC | Customer still on the bus with you, right? |
| B/O | Yes, customers all off, but customer with wheelchair still on. 10-4 |
| CC | I have a patrol car trying to locate you, that's why I said. Last bus stop on Park Row, correct? |
| B/O | Yeah, going northbound |
| CC | He's right around, be there in a minute. |
| 18:53 | |
| CC | Yeah Dennis, see if we can make heads or tails. He said by Park Row, the last bus stop, north bound by the barricades. Does that make sense? |
| SLD | (unintel) barricades now, going right into them |
| CC | All right. Still waiting. Customer agitated. |
| SLD | As long as wheelchair lift is human, if she don't want to turn off wheelchair lift, it is not a big deal as long as she's not wanting to pop a wheelie. |
| CC | Yeah, I hear you. But now, well I guess the customer got irate and was going up and down the aisles, I don't know what's going on down there. Let me know when you get down there, let me know the whole thing. Copy. |
| 1903 | |
| SLD | 5232 back in service, going special to 4th street for wheelchair customer because she's _____ . for further instruction. |
| CC | All right, Dennis, copy, console, 19:05, thanks |
| SLD | There was a misunderstanding, that's all it was. |
| CC | Thanks, Dennis, copy. |
| SLD | You're welcome. |

# EXHIBIT E

9948
AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x

ROBIN STEPHENS,
Plaintiff,

-against-

SUPER SHUTTLE, INC., SUPER
SHUTTLE INTERNATIONAL, INC., NEW
YORK CITY TRANSIT AUTHORITY,
MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY and
"JOHN DOE," NYCT BUS DRIVER
Defendants.
------------------------------------------------------- x

Index #104791/2007
(Marrero, J.)

DECLARATION BY DENNIS
ELY IN SUPPORT OF
TRANSIT DEFENDANTS'
MOTION TO DISMISS

DENNIS ELY, declares pursuant to 28 U.S.C. § 1746 that:

1.    This declaration is submitted in support of the motion to dismiss by Defendants New York City Transit Authority ("NYCTA") and Manhattan and Bronx Surface Transit Operating Authority(" MaBSTOA") (Jointly "Transit Defendants") in the above captioned action.

2.    I am a Surface Line Dispatcher for MaBSTOA. I have been employed by MaBSTOA since 1985, initially as a Bus Operator and, from January 1994, as a Surface Line Dispatcher. I make this declaration based on personal knowledge and belief and on review of the records of the incident held by the Transit Defendants.

3.    In my work as a bus dispatcher and, prior to that time, as a bus operator, I have frequently interacted with passengers who use automated wheelchairs.

4.    I have assisted on a number of occasions when an automated wheelchair lost power while boarding or aboard a MaBSTOA bus. In those instances, the axel had locked and a special release had to be located and engaged in order to release the axle so that wheelchair could be pushed manually.

5.    It is standard procedure for the Transit Defendants' bus operators to secure wheelchairs by use of restraining straps on the bus. In the interest of safety of the passenger using such a wheelchair, other passengers and the bus operator, it is desirable that the passenger turn off his or her wheelchair both on the wheelchair lift and also when riding on the bus, prior to the bus operator attaching securing straps to the wheelchair. Typically, as noted in paragraph 4, when an automated wheelchair is powered off, its axle locks.

6.    Plaintiff's allegation in the Amended Complaint, ¶ 84, that "[h]ad [she] turned off her wheelchair without the chair secured, the movement of the bus would have caused her to be thrown about on the bus" is contrary to my experience with automated wheelchairs. Powering off the wheelchair prevents accidental engagement of the wheelchair while it is on the bus or on the wheelchair lift.

7.    *All* wheelchairs should be secured in the bus while the bus is moving but an automated wheelchair is more secure with power off and the axle locked than with power on, because of the greater danger of accidental engagement with power on.

8.    I responded to the incident alleged in the Amended Complaint on April 9, 2006. The bus was located at a bus stop on Park Row, behind 1 Police Plaza.

9.    When I boarded the bus, after learning that Plaintiff, Ms. Stephens, would not power off her wheelchair, I requested that she be careful not to engage the wheelchair while Bus Operator Gregory attached the restraints.

10.    Following his attachment of the restraints, Bus Operator Gregory drove Plaintiff to her destination and she de-boarded without incident. I followed the bus in the vehicle I was assigned that day. The total delay was approximately 30 minutes.

2

#989707
2007-9948

11.    The incident was based on Plaintiff's misunderstanding of and refusal to comply with Bus Operator Gregory's request, in the interest of safety, that she power off her wheelchair so that he could secure it.

Executed at the Bronx, New York, this __24th__ day of July, 2007, subject to the penalties of perjury.

_Dennis Ely_
**Dennis Ely**

#989707
2007-9948

# EXHIBIT F

ISO9001
ISO14001
ISO13485
CERTIFIED



# MEDICAL POWER WHEELCHAIR
# User Manual



**WIZZ** *888WNL*



**STREAMER** *888WB*



**STREAMER** *888WAB*



**STREAMER** *888WSB*



**JETSTREAM-M** *888WAM*



**JETSTREAM-L** *888WAL*



EMI
ISO9001
ISO14001
ISO13485
CERTIFIED

# CONTENTS

INTRODUCTION                                          page 2

FEATURE GUIDE                                         page 2 --4

EMI WARNING                                           page 5 – 6

SAFETY INSTRUCTIONS                                   page 7 -- 8

WARNING, CAUTION AND INDICATION LABEL LOCATION   page 9 -- 11

PREPARATION FOR USE                                  page 12 -- 13

ADJUSTMENT PROCEDURES                                page 14 – 16

OPERATION INSTRUCTIONS                               page 17 – 18

DISASSEMBLY INSTRUCTIONS                             page 19 – 20

BATTERIES AND BATTERY CHARGING                       page 21 – 23

TROUBLESHOOTING                                      page 24 -- 25

SPECIFICATION                                        page 26

QUARTERLY INSPECTION                                 page 27

DISCLAIMER                                           page 28



ISO9001
ISO14001
ISO13485
CERTIFIED

# EMI WARNING

## ELECTROMAGNETIC INTERFERENCE (EMI) FROM RADIO WAVE SOURCES

Medical Power Wheelchairs (Hereinafter referred to as "Powerchair") may be susceptible to electromagnetic interference (EMI), which is a kind of interfering electromagnetic energy (EM) emitted from sources such as radio stations, TV stations, amateur radio (HAM) transmitters, two-way radio, and cellular phones. The interference (from radio wave sources) can cause the Powerchair to release its brakes, move by itself, or move in unintended directions. It can also permanently damage the Powerchair's control system.

The sources of radiated EMI can be broadly classified into three types:

1. Hand-held portable transceivers (transmitters-receivers) with the antenna mounted directly on the transmitting unit. Examples include: citizens band (CB) radios, "walkie talkie", security, fire and police transceivers, cellular telephones, and other personal communication devices.

**NOTE! Some cellular telephones and similar devices transmit signals while they are ON, even when not being used.**

2. Medium-Range mobile transceivers, such as those used in police cars, fire trucks, ambulances, and taxis. These usually have the antenna mounted on the outside of the vehicle.
3. Long-range transmitters and transceivers, such as commercial broadcast transmitters (radio and TV broadcast antenna towers) and amateur (HAM) radios.

**NOTE! Other types of hand-held devices, such as cordless phones, laptop computers, AM/FM radios, TV sets, CD players, and cassette players, and small appliances, such as electric shavers and hair dryers, so far as we know, are not likely to cause problems to the Powerchair.**

GMP
ISO9001
ISO14001
ISO13485
CERTIFIED

# EMI WARNING

## POWERCHAIR ELECTROMAGNETIC INTERFERENCE (EMI)

Because EM energy rapidly becomes more intense as one moves closer to the transmitting antenna (source), the EM fields from hand-held radio sources (transceivers) are of special concern. It is possible to unintentionally bring high levels of EM energy very close to the Powerchair's control system while using these devices. This can affect Powerchair movement and braking. Therefore, the warnings listed below are recommended to prevent possible interference with the control system of the Powerchair.

## WARNINGS

1. Do not operate hand-held transceivers (transmitters-receivers), such as citizens band (CB) radios, or turn ON personal communication devices, such as cellular phones, while the Powerchair is turned ON.
2. Be aware of nearby transmitters, such as radio or TV stations, and try to avoid coming close to them.
3. If unintended movement or brake release occurs, turn the Powerchair OFF as soon as it is safe.
4. Be aware that adding accessories or components, or modifying the Powerchair, may make it more susceptible to EMI.

**NOTE! There is no easy way to evaluate the overall immunity of the Powerchair.**

5. Report all incidents of unintended movement or braking to the  Powerchair provider, and note whether there are sources of EMI nearby.

# EXHIBIT G



**OWNER'S MANUAL**



*The First Name in Travel Mobility*™



Exeter, PA
St. Catharines, ON     **1-800-800-8586**

*www.pridemobility.com*

# SAFETY GUIDELINES

The symbols below are used throughout this owner's manual and on the Go-Chair to identify warnings and important information. It is very important for you to read them and understand them completely.

 **WARNING! Failure to follow designated procedures can cause either personal injury, component damage, or malfunction (black symbol on yellow triangle with black border).**

 **MANDATORY! These actions should be performed as specified. Failure to perform mandatory actions can cause injury to personnel and/or damage to equipment (white symbol on blue dot).**

 **PROHIBITED! These actions should be prohibited. These actions should not be performed at any time or in any circumstances. Performing a prohibited action can cause injury to personnel and/or damage to equipment (black symbol with red circle and red slash).**

This product is not approved as a medical device and is coded by the SADMERC as A9270 (non-covered item).

Copyright © 2005
Pride Mobility Products Corp.
INFMANU2881/RevC/Aug05

# C O N T E N T S

I.     INTRODUCTION ................................................................................................................. 4

II.    SAFETY ............................................................................................................................... 6

III.   YOUR GO-CHAIR ............................................................................................................. 15

IV.    ASSEMBLY/DISASSEMBLY ........................................................................................... 19

V.     COMFORT ADJUSTMENTS ............................................................................................. 22

VI.    BATTERIES AND CHARGING ......................................................................................... 24

VII.   OPERATION ...................................................................................................................... 28

VIII.  CARE AND MAINTENANCE ........................................................................................... 32

IX.    WARRANTY ...................................................................................................................... 36

This owner's manual is compiled from the latest specifications and product information available at the time of publication. We reserve the right to make changes as they become necessary. Any changes to our products may cause slight variations between the illustrations and explanations in this manual and the product you have purchased.

# II. SAFETY



**Figure 1. Maximum Safe Incline/Decline Angles**

## Braking Information

Your Go-Chair is equipped with two powerful brake systems:

1. Regenerative — uses electricity to rapidly slow the vehicle when the joystick returns to the center/stop position.
2. Disc Park Brake — activates mechanically after regenerative braking slows the vehicle to near stop, or when power is removed from the system for any reason.

## Cornering Information

While your Go-Chair is equipped with two caster wheels and two anti-tip wheels, excessively high cornering speeds can still create the possibility of tipping. Factors which affect the possibility of tipping include, but are not limited to: cornering speed, steering angle (how sharply you are turning), uneven road surfaces, inclined road surfaces, riding from an area of low traction to an area of high traction (such as passing from a grassy area to a paved area – especially at high speed while turning), and abrupt directional changes. High cornering speeds are not recommended. If you feel that you may tip over in a corner, reduce your speed and steering angle (i.e., lessen the sharpness of the turn) to prevent your Go-Chair from tipping.

 **WARNING! When cornering sharply, reduce your speed. This greatly reduces the possibility of a tip or fall. To avoid personal injury and/or property damage, always exercise common sense when cornering.**

## Public Streets and Roadways

 **WARNING! You should not operate your Go-Chair on public streets and roadways. Be aware that it may be difficult for traffic to see you when you are seated on your Go-Chair. Obey all local pedestrian traffic rules. Wait until your path is clear of traffic, and then proceed with extreme caution.**

## Freewheel Mode

Your Go-Chair is equipped with two manual freewheel levers to allow for manual maneuverability by a trained attendant. For more information about how to place your Go-Chair into and out of freewheel mode, see III. "Your Go-Chair."

**WARNING! Do not use your Go-Chair in freewheel mode without an attendant present. Personal injury may result.**

 **WARNING! Do not attempt to personally place your Go-Chair in freewheel mode while seated on it. Personal injury may result. Ask an attendant for assistance if necessary.**

**WARNING! Do not place your Go-Chair in freewheel mode while on an incline. The chair could roll uncontrollably on its own, causing personal injury.**

# II. SAFETY

## Removable Parts

 **WARNING! Do not attempt to lift or move a Go-Chair by any of its removable parts. Personal injury and/or damage to the Go-Chair may result.**

## Preventing Unintended Movement

 **WARNING! If you anticipate being seated in a stationary position for an extended period of time, turn off the power. This will prevent unexpected motion from inadvertent joystick contact. This will also eliminate the possibility of unintended Chair movement from electromagnetic (EMI) sources. Failure to do so may result in personal injury.**

## Prescription Drugs/Physical Limitations

Users must exercise care and common sense when operating a Go-Chair. This includes awareness of safety issues when taking prescribed or over-the-counter drugs or when the user has specific physical limitations.

 **WARNING! Consult your physician if you are taking prescribed or over-the-counter medication or if you have certain physical limitations. Some medications and limitations may impair your ability to operate your Go-Chair in a safe manner.**

## Alcohol

The Go-Chair user must exercise care and common sense when operating his/her Go-Chair. This includes awareness of safety issues while under the influence of alcohol.

 **WARNING! Do not operate your Go-Chair while you are under the influence of alcohol, as this may impair your ability to operate your Go-Chair in a safe manner.**

## Electromagnetic and Radio Frequency Interference (EMI/RFI)

 **WARNING! Laboratory tests have shown that electromagnetic and radio frequency waves can have an adverse affect on the performance of electrically-powered mobility vehicles.**

Electromagnetic and Radio Frequency Interference can come from sources such as cellular phones, mobile two-way radios (such as walkie-talkies), radio stations, TV stations, amateur radio (HAM) transmitters, wireless computer links, microwave signals, paging transmitters, and medium-range mobile transceivers used by emergency vehicles. In some cases, these waves can cause unintended movement or damage to the control system. Every electrically-powered mobility vehicle has an immunity (or resistance) to EMI. The higher the immunity level, the greater the protection against EMI. This product has been tested and has passed at an immunity level of 20 V/m.

 **WARNING! Be aware that cell phones, two-way radios, laptops and other types of radio transmitters may cause unintended movement of your electrically-powered mobility vehicle due to EMI. Exercise caution when using any of these items while operating your mobility vehicle and avoid coming into close proximity of radio and TV stations.**

**WARNING! The addition of accessories or components to the electrically-powered mobility vehicle can increase the susceptibility of the vehicle to EMI. Do not modify your travel chair in any way not authorized by Pride.**

**WARNING! The electrically-powered mobility vehicle itself can disturb the performance of other electrical devices located nearby, such as alarm systems.**

*NOTE: For further information on EMI/RFI, go to the Resource Center on www.pridemobility.com. If unintended motion or brake release occurs, turn your travel chair off as soon as it is safe to do so. Call Pride at 800-424-8205 to report the incident.*

# EXHIBIT H



# Jazzy Select 14

## Owner's Manual

*"The way a Power Chair Should Feel!"*

Exeter, PA
St. Catharines, ON

1-800-800-8586

*www.pridemobility.com*

# S A F E T Y   G U I D E L I N E S

The symbols below are used throughout this owner's manual and on the power chair to identify warnings and important information. It is very important for you to read them and understand them completely.

 **WARNING!** Failure to follow designated procedures can cause either personal injury, component damage, or malfunction (black symbol on yellow triangle with black border).

 **MANDATORY!** These actions should be performed as specified. Failure to perform mandatory actions can cause injury to personnel and/or damage to equipment (white symbol on blue dot).

 **PROHIBITED!** These actions should be prohibited. These actions should not be performed at any time or in any circumstances. Performing a prohibited action can cause injury to personnel and/or damage to equipment (black symbol with red circle and red slash).

Copyright © 2006
Pride Mobility Products Corp.
INFMANU3198/Rev A/June 06

# C O N T E N T S

**I.    INTRODUCTION** ................................................................................................................4

**II.    SAFETY** ........................................................................................................................6

**III.   YOUR POWER CHAIR** ..............................................................................................16

**IV.   ASSEMBLY** ...............................................................................................................20

**V.    COMFORT ADJUSTMENTS** ....................................................................................22

**VI.   BATTERIES AND CHARGING** ................................................................................27

**VII.  OPERATION** .............................................................................................................31

**VIII. CARE AND MAINTENANCE** ...................................................................................35

**IX.   WARRANTY** ..............................................................................................................41

This owner's manual is compiled from the latest specifications and product information available at the time of publication. We reserve the right to make changes as they become necessary. Any changes to our products may cause slight variations between the illustrations and explanations in this manual and the product you have purchased.

# II. SAFETY

**WARNING! When climbing an incline, do not zigzag or drive at an angle up the face of the incline. Drive your power chair straight up the incline. This greatly reduces the possibility of a tip or a fall. Always exercise extreme caution when negotiating an incline.**



**WARNING! You should not travel up or down a potentially hazardous incline (i.e., areas covered with snow, ice, cut grass, or wet leaves).**

**WARNING! When on any sort of an incline or decline, never place the power chair in freewheel mode while seated on it or standing next to it. Doing so may result in personal injury and/or damage to your power chair.**

**WARNING! Never travel down an incline backwards. This may result in personal injury.**

In compliance with the Americans with Disabilities Act of 1990, all handicap public access ramps are required to have a maximum slope of 5° (8.7%). Therefore, Pride recommends that the maximum slope of an incline you attempt to safely ascend or descend on your power chair does not exceed 5° (8.7%). See figure 1.



**WARNING! Any attempt to climb or descend a slope steeper than 5° (8.7%) may put your power chair in an unstable position and cause it to tip, resulting in personal injury.**



5° (8.7%)

**Figure 1. Maximum Safe Angle (Ascending and Descending)**

## Braking Information

Your power chair is equipped with two powerful brake systems:
1. Regenerative — uses electricity to rapidly slow the vehicle when the joystick returns to the center/stop position.
2. Disc Park Brake — activates mechanically after regenerative braking slows the vehicle to near stop, or when power is removed from the system for any reason.

## Cornering Information

While your power chair is equipped with rear caster wheels and front anti-tip wheels, excessively high cornering speeds can still create the possibility of tipping. Factors which affect the possibility of tipping include, but are not limited to: cornering speed, steering angle (how sharply you are turning), uneven road surfaces, inclined road surfaces, riding from an area of low traction to an area of high traction (such as passing from a grassy area to a paved area – especially at high speed while turning), and abrupt directional changes. High cornering speeds are not recommended. If you feel that you may tip over in a corner, reduce your speed and steering angle (i.e., lessen the sharpness of the turn) to prevent your power chair from tipping.



**WARNING! When cornering sharply, reduce your speed. This greatly reduces the possibility of a tip or fall. To avoid personal injury and/or property damage, always exercise common sense when cornering.**

# II. SAFETY

## Inclement Weather Precautions

Exposure of your power chair to inclement weather conditions should be avoided whenever possible. If suddenly caught up in rain, snow, severe cold or heat while operating your power chair proceed to shelter at the earliest opportunity. Thoroughly dry your power chair before storing, charging, or operating your power chair

 **WARNING! Operating in rain, snow, salt, mist/spray conditions, and on icy/slippery surfaces can cause personal injury and/or damage to the power chair and electrical system. Maintain and store your power chair in a dry and clean condition.**

## Reaching and Bending

Never reach, lean, or bend while driving your power chair. If it is absolutely necessary to reach, lean, or bend while seated on your power chair, it is important to maintain a stable center of gravity and keep the power chair from tipping. Pride recommends that the power chair user determine his/her personal limitations and practice bending and reaching in the presence of a qualified healthcare professional.

 **WARNING! Do not bend, lean, or reach for objects if you have to pick them up from the floor by reaching down between your knees. Movements such as these may change your center of gravity and the weight distribution of the power chair. This may cause your power chair to tip, possibly resulting in personal injury.**

**WARNING! Prevent personal injury! Keep your hands away from the tires when driving. Be aware that loose fitting clothing can become caught in drive tires.**

## Batteries

In addition to following the warnings below, be sure to comply with all other battery handling information. For more information about your power chair's batteries, see VI. "Batteries and Charging."

 **WARNING! Power chair batteries are heavy. See specifications table. If you are unable to lift that much weight, be sure to get help. Lifting beyond your capacity can result in personal injury.**

**WARNING! Battery posts, terminals, and related accessories contain lead and lead compounds. Wash hands after handling.**

**WARNING! Always protect the batteries from freezing and never charge a frozen battery. Charging a frozen battery may result in personal injury and/or damage to the battery.**

## Preventing Unintended Movement



## Prescription Drugs/Physical Limitations

Users must exercise care and common sense when operating a power chair. This includes awareness of safety issues when taking prescribed or over-the-counter drugs or when the user has specific physical limitations.

 **WARNING! Consult your physician if you are taking prescribed or over-the-counter medication or if you have certain physical limitations. Some medications and limitations may impair your ability to operate your power chair in a safe manner.**

# EXHIBIT I

TEFTEC® Corporation

P/N C013-000004-AA



# Owners Manual

**Read this manual before operating your TEFTEC® wheelchair**

**TEFTEC® Corporation**
P/N C013-000004-AA

## CONTENTS

I.  INTRODUCTION.................................................................................3

II.  SAFETY PRECAUTIONS...................................................................5

III.  HANDLING TIPS..............................................................................8

IV.  GETTING STARTED......................................................................11

       BetaTrac CHARACTERISTICS...........................................12

V.  OPERATING INSTRUCTIONS.......................................................20

VI.  MAINTENANCE.............................................................................22

       BATTERIES...........................................................................23

VII.  TROUBLESHOOTING...................................................................36

VIII.  LIMITED WARRANTY...................................................................39

IX.  FREQUENTLY ASKED QUESTIONS............................................41

X.  INDEX............................................................................................42



**TEFTEC® Corporation**
P/N C013-000004-AA

⚠ **WARNING:** Avoid high speeds and making turns while traveling downhill. The BetaTrac® may tip forward when subjected to harsh deceleration going downhill.

⚠ **WARNING:** Do not tie down or attach anything to the wheels in any way. This could cause tipping and possibly result in injury or damage to the wheelchair.

⚠ **WARNING:** When using a wheelchair lift, turn the wheelchair power switch OFF.

⚠ **WARNING:** Do not enter or exit the wheelchair without first turning the hand control power switch OFF.

⚠ **WARNING:** Disengaging freewheel lever will also disengage the electromechanical park brake and allow the wheelchair to roll.

⚠ **WARNING:** Do not lean over the top of wheelchair back. This could cause the wheelchair to tip.

⚠ **WARNING:** Do not stand or step on the footplates while transferring to or from your wheelchair. This could cause the wheelchair to tip.

⚠ **WARNING:** Ensure that no water, moisture, or other liquid enters the hand control or motor controllers.

⚠ **WARNING:** The controller should be adjusted only by a qualified therapist or technician. This person must evaluate the occupant's ability, weight, and physical condition, the environment in which the wheelchair will be used, and the terrain over which the wheelchair will travel. The controller's range of adjustment and versatility is provided so that the requirements of many different abilities may be met, and the person setting the driving characteristics has the responsibility of making certain that the user can safely operate the wheelchair at the speed and rates selected.

⚠ **WARNING:** When adjusting with the programmer, use caution when changing the individual parameters to a setting different than that provided by the presets. Make adjustments one at a time. Refer to Liber-T Medtech Premier Owners Manual.



⚠ **WARNING:** Do not use any adaptive control devices other than those provided or recommended by TEFTEC®.

⚠ **WARNING:** Connecting accessories to the batteries will decrease driving range and shorten battery life. Do not connect ANYTHING to only one battery; this will cause premature battery failure.

⚠ **WARNING:** Never connect a respirator or other life-support device to the wheelchair batteries, since it will shorten the battery operating time. This could cause an unanticipated failure of both the wheelchair and the life-support equipment.

⚠ **WARNING:** Unauthorized modification could create a hazardous condition, which could result in serious injury.

⚠ **WARNING:** The use of non-TEFTEC® replacement parts could create a hazardous condition, which could result in serious injury.

⚠ **WARNING:** Standard weight capacity for the BetaTrac® wheelchair is 650 pounds.

⚠ **WARNING:** Keep all cables away from the moving parts of the wheelchair.

⚠ **WARNING:** As a safety feature, this wheelchair is equipped with fail-safe electromechanical park brake. Any interruption in the power supply will cause this brake to immediately engage and stop the wheelchair. If the occupant is not properly positioned, an unanticipated stop could pitch the occupant forward and out of the wheelchair. Review the Owners Manual and consult with your dealer regarding proper positioning and use of this wheelchair.

TEFTEC® specifically disclaims responsibility for any bodily injury or property damage which may occur during any use which does not comply with federal, state or local laws or ordinances.



# EXHIBIT J

*Alante' Jr. GP-200 Manual Revised3-9-07Final*



# Owner's Manual



## *Alante Jr.*
## Rear-Wheel Drive Power Chair
## Model GP 200



YOUR LIFE IN MOTION

| 401 Bridge Street, Old Forge, PA 18518 |
| Tel: 800-624-6374  Fax: 570-451-7494 |
| www.goldentech.com |

*Alante' Jr. GP-200 Manual Revised3-9-07Final*

# EMI / RFI

The rapid development of electronics, especially in the area of communications, has saturated our environment with electromagnetic (radio) waves that are emitted by television transmitters, cellular phones, citizen's band radios (CBs) amateur radios (HAM radios), wireless computer links, microwave transmitters, paging transmitters, etc.  These electromagnetic (EM) waves are invisible and increase in strength the closer one gets to the source of transmission.  When these energy waves act upon electrical devices and cause them to malfunction or to function in an erratic or uncontrolled manner, they are referred to as Electromagnetic Interference (EMI) or Radio Frequency Interference (RFI).

## EMI / RFI  AND YOUR ALANTE JR.™

All electrically powered vehicles, including power chairs are susceptible to EMI / RFI.  This interference could result in abnormal or unintended movement of your Golden *Alante Jr.*

The FDA has determined that each make and model of power chair can resist EMI/RFI to a certain level.  The higher the level of immunity, the greater the degree of protection from EMI/RFI measured in volts per meter (V/m).  The FDA has also determined that current technology is capable of providing 20 V/m of immunity to EMI/RFI, which would provide useful protection against common sources of interference.

Based on that determination, the FDA has written to the manufacturers of power wheel-chairs and asked them to test their new products to be certain that they provide a reasonable degree of immunity to EMI/RFI.  The FDA suggests that power chairs should have an immunity level of 20 V/m.  The immunity level of the Golden *Alante Jr.* has been tested and has an immunity level of 20 V/m without accessories connected to it.

## EMI / RFI RECOMMENDATIONS

- Do not turn on or use hand-held personal electronic communication devices such as cellular phones, walkie-talkies, or CB radios while your power chair is turned on.
- Be aware of any nearby transmitters (radio, television, microwave, etc.) on your intended route and avoid operation your of power chair close to any of those transmitters.
- Turn off the power if your *Alante Jr.* is going to be in a stationary position for any length of time.
- Be aware that adding accessories or components or modifying your power chair may make it more susceptible to EMI / RFI.
- If unintended movement or brake release occurs, turn your power chair off as soon as it is safe to do so.
- Report all incidents of unintended movement or brake failure to your Golden Technologies representative or to Golden Technologies.

**WARNING TURN OFF YOUR POWER CHAIR AS SOON AS IT IS SAFELY POSSIBLE IF UNINTENDED OR UNCONTROLLABLE MOTION OCCURS OR IF UNINTENDED BRAKE RELEASE OCCURS.**

# EXHIBIT K



# Cirrus Plus

## OWNERS MANUAL & INSTRUCTIONS



12 Harbor Park Drive, Port Washington, NY 11050

Toll Free: 877-224-0946 • 516-998-4600

Website: www.drivemedical.com

# SAFE DRIVING TECHNIQUES

## DRIVING YOUR POWER WHEELCHAIR

## BEFORE SITTING IN YOUR CIRRUS PLUS WHEELCHAIR INSURE THAT:

1. The Power wheelchair is switched off.
2. Be certain motor freewheel levers are in the "engaged" position
3. The battery charger is disconnected

After transferring make sure that you are comfortably positioned and that the leg rests and armrests have been adjusted to suit your needs. The position of the joystick should be easy to reach so as to eliminate muscle fatigue during driving.

## TO COMMENCE:

1. Set the speed control of the chair to SLOW.
2. Press the "on / off" switch.
3. Push the joystick gently in the direction you whish to travel applying a steady even pressure. The further you push the joystick, the faster the chair will go. The chair will stop when you return the joystick to the neutral or vertical position.
4. Directional control is achieved by gently moving the joystick in the direction you wish to go. Pull back to reverse.
5. The controller can be programmed to give you the best feel for all driving situations and only needs a light touch to respond - Contact your dealer for programming.

**IN THE CASE OF AN EMERGENCY AND TO STOP THE CIRRUS PLUS WHEELCHAIR FROM MOVING, LET THE JOYSTICK GO AND THE CHAIR WILL COME TO A STOP.**

10

## SAFE DRIVING

1. Never drive at a speed greater than your ability to safely control your chair. Remember that wet or loose surfaces need greater care and control.
2. Always turn the chair off and engage the wheel locks when transferring or while the chair is stationary for long periods.
3. Avoid jerky stop/start motions as this will result in excessive current draw from the batteries, increased tire wear and the rapid wearing of the gearbox and motors.
4. Keep your chair clean from sand and salt water.

## INDOOR / OUTDOOR DRIVING

When driving indoors keep the level of speed to a minimum to avoid the risk of collision.

For outdoor driving be wary of wet surfaces, loose sand, large curbs and potholes. A little practice will ensure you understand the capabilities of your chair and enable you to overcome the most common obstacles while operating the Cirrus Plus Wheelchair.

If operating your chair on the roads please check with your local transportation law enforcement regarding necessary identification and safety devices such as reflectors.

## CHAIR OPERATION ON SURFACES THAT REQUIRE SPECIAL CARE

When driving up or down ramps it is recommended that the user:
1. Visually checks to see if the angle of the slope is less than 6°.
2. Checks to see that the ramp surface has GRIP to prevent slippage.
3. Ensures that the ramp surface is correctly in line with the tires and is wide enough to allow the tires to pass freely along the ramp.

If the ramp meets these conditions, it is recommended that the user drives the wheelchair slowly up or down the ramp, ensuring that the chair is driven in the center of the ramp. If possible, have an assistant monitor the chairs' progress, and prevent tipping of the chair by holding the push handles at the back of the seat.

**If the ramp does not meet these conditions, it is recommended that alternative methods for climbing and descending be found.**

11

# EXHIBIT L

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

Complaint No:
M-E-AR-01-1010596-E

----------------------------------------------+

In the Matter of the Complaint of

NATHANIEL PINKSTON,

                                    Complainant,

          - against -

NYC TRANSIT AUTHORITY, MTA/NYC TRANSIT EMPLOYEE
ASSISTANCE PROGRAM,

                                    Respondents

Notice of
Administrative
Closure

----------------------------------------------+

The above-captioned case is hereby administratively closed pursuant to Section 8-113(c) of the Administrative Code of the City of New York on the following grounds:

Pursuant to an amendment to the New York State Public Authorities Law, effective May 15, 2000, the Commission on Human Rights lacks jurisdiction over the New York City Transit Authority.

**PLEASE TAKE NOTICE** that pursuant to Rule 1-22(f) of the Rules of Practice of the New York City Commission on Human Rights. a complainant or respondent may apply in writing to the Commission for the reopening of this case. Such application must be made within thirty days of service of this order and must be upon notice to all parties to the complaint. Address any request for reopening to Office of Docketing, New York City Commission on Human Rights, 40 Rector Street, 9th Floor, New York, NY 10006. 9th Floor, New York, NY 10006.

Dated: New York, New York

March 7, 2002

_____
Jennifer K. Siegel
Managing Attorney
Law Enforcement Bureau
New York City Commission on Human Rights

CITY OF NEW YORK                                    Complaint No:
COMMISSION ON HUMAN RIGHTS                          M-E-AD-01-1010481-D

+--------------------------------------------------+  16+ A1 0262
| In the Matter of the Complaint of                |
|                                                  |
|   PETER J. ARONICA,                              |
|                                                  |
|                          Complainant,            |      Notice of
|           - against -                            |   Administrative
|                                                  |      Closure
| NEW YORK CITY TRANSIT AUTHORITY, JOSEPH JOCE,    |
| PETER VELAZQUEZ,                                 |
|                                                  |
|                          Respondents             |
+--------------------------------------------------+

     The above-captioned case is hereby administratively closed
pursuant to Section 8-113 of the Administrative Code of the City of New
York on the following grounds:

     On January 20, 2002, the New York City Transit Authorities ("NYCTA")
informed the Commission of an amendment to the New York State Public
Authorities Law effective May 15, 2000. Pursuant to this law the
Commission is precluded from asserting jurisdiction over NYCTA.
Therefore, the Commission shall dismiss this complaint because it is
not within the jurisdiction of the Commission based on Section 8-113(c).
Your claim with the Equal Employment Opportunity Commission is not
dismissed.

     **PLEASE TAKE NOTICE** that pursuant to Rule 1-22(f) of the Rules of
Practice of the New York City Commission on Human Rights a complainant
or respondent may apply in writing to the Commission for the reopening
of this case. Such application must be made within thirty days of
service of this order and must be upon notice to all parties to the
complaint. Address any request for reopening to Office of Docketing,
New York City Commission on Human Rights, 40 Rector Street, 9th Floor,
New York, NY 10006. 9th Floor, New York, NY 10006.

Dated: New York, New York

March 7, 2002

                              _____
                              Jennifer K. Siegel
                              Managing Attorney
                              Law Enforcement Bureau
                              New York City Commission on Human Rights

8672 RW

ITY OF NEW YORK                                      Complaint No:
OMMISSION ON HUMAN RIGHTS                            M-E-D-01-1010120-D
-------------------------------------------------+
In the Matter of the Complaint of                 | 16-F A2 0106
                                                  |
JEFFERY L. GETHERS,                               |
                                                  |
                            Complainant,          |       Notice of
            - against -                           |    Administrative
                                                  |        Closure
NEW YORK CITY TRANSIT AUTHORITY, ALAN GANSER,     |
HARRY P. GAGAS,                                   |
                                                  |
                            Respondents  |
-------------------------------------------------+

    The above-captioned case is hereby administratively closed
ursuant to Section 8-113.c of the Administrative Code of the City of New
ork on the following grounds:

    On January 20, 2002, the New York City Transit Authority ("NYCTA")
nformed the Commission of an amendment to the New York State Public
uthorities Law, effective May 15, 2000. Pursuant to this law the
ommission is precluded from asserting jurisdiction over NYCTA.
erefore, the Commission shall dismiss this complaint pursuant to
ction 8-113.c because it is not within its jurisdiction. The claim
led with the Equal Employment Opportunity Commission is not dismissed.

    **PLEASE TAKE NOTICE** that pursuant to Rule 1-22(f) of the Rules of
actice of the New York City Commission on Human Rights a complainant
 respondent may apply in writing to the Commission for the reopening
 this case. Such application must be made within thirty days of
rvice of this order and must be upon notice to all parties to the
mplaint. Address any request for reopening to Office of Docketing,
w York City Commission on Human Rights, 40 Rector Street, 9th Floor,
w York, NY 10006. 9th Floor, New York, NY 10006.

ted: New York, New York

*March 7, 2002*


                            _____
                            Jennifer K. Siegel
                            Managing Attorney
                            Law Enforcement Bureau
                            New York City Commission on Human R

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

Complaint No:
M-E-LR-01-1011050-E

```
+----------------------------------------------------+
| In the Matter of the Complaint of                  | 1 of AI 0364
|                                                    |
|    HERMAN LAMBEY,                                  |                \
|                                       Complainant, |     Notice of
|                                                    |   Administrative
|               - against -                          |       Closure
|                                                    |
|    MTA NEW YORK CITY TRANSIT AUTHORITY,            |
|                                                    |
|                                       Respondent   |
+----------------------------------------------------+
```

        The above-captioned case is hereby administratively closed pursuant to Section 8-119 of the Administrative Code of the City of New York on the following grounds:

        Pursuant to an amendment to the New York State Public Authorities Law, effective May 15, 2000, the Commission on Human Rights lacks jurisdiction over the New York City Transit Authority.

        **PLEASE TAKE NOTICE** that pursuant to Rule 1-22(f) of the Rules of Practice of the New York City Commission on Human Rights a complainant or respondent may apply in writing to the Commission for the reopening of this case. Such application must be made within thirty days of service of this order and must be upon notice to all parties to the complaint. Address any request for reopening to Office of Docketing, New York City Commission on Human Rights, 40 Rector Street, 9th Floor, New York, NY 10006. 9th Floor, New York, NY 10006.

Dated: New York, New York

*March 7, 2002*

_____
Jennifer K. Siegel
Managing Attorney
Law Enforcement Bureau
New York City Commission on Human Rights

CITY OF NEW YORK
COMMISSION ON HUMAN RIGHTS

Complaint No:
M-E-DS-00-1009264

In the Matter of the Complaint of

ANDREW BLITZER,

Complainant,

Notice of
Administrative
Closure

- against -

NYC TRANSIT AUTHORITY,

Respondent

The above-captioned case is hereby administratively closed pursuant to Section 8-113 (c) of the Administrative Code of the City of New York on the following grounds:

The Commission lacks jurisdiction over the instant complaint as a result of the amendment of Section 1266(8) of the Public Authorities Law effective May 15, 2000. The instant complaint was filed on August 7, 2000, subsequent to the effective date of this amendment.

PLEASE TAKE NOTICE that pursuant to Rule 1-22(f) of the Rules of Practice of the New York City Commission on Human Rights a complainant or respondent may apply in writing to the Commission for the reopening of this case. Such application must be made within thirty days of service of this order and must be upon notice to all parties to the complaint. Address any request for reopening to the Office of Docketing, New York City Commission on Human Rights, 40 Rector Street, 9th Floor, New York, New York 10006.

Dated: New York, New York
7/31/02

Jennifer K. Siegel
Managing Attorney
Law Enforcement Bureau
New York City Commission on Human Rights